UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------ x

```
USDC SNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: August_1, 2013
```

MICHAEL WARD d/b/a BRAINTEASER  :
PUBLICATIONS,                    :
                                 :
                  Plaintiff,     :
                                 :
        - against -              :            12 Civ. 07987 (PAC)
                                 :
ANDREWS MCMEEL PUBLISHING,       :            OPINION & ORDER
LLC,                             :
                                 :
                  Defendant.     :
------------------------------------------------------ x

HONORABLE PAUL A. CROTTY, United States District Judge:

Plaintiff Michael Ward ("Ward") brought this action against Andrews McMeel
Publishing, LLC ("AMP") on October 26, 2012, asserting claims of copyright infringement,
trade dress infringement, and common law unfair competition. On February 2, 2013, AMP
moved to dismiss pursuant to Fed. R. Civ. P. 12(b)(6). For the reasons discussed below, the
Court GRANTS AMP's motion to dismiss the trade dress claim, with leave to replead, and
DENIES AMP's motion to dismiss the copyright and unfair competition claims.

## BACKGROUND[1]

Ward, doing business as Brainteaser Publications, has been publishing a highly
successful series of "Scratch & Solve Hangman" books (the "S&S Books") for approximately
twenty years. In the most basic form of the classic hangman word game, one player thinks of a
word or phrase, which a second player is required to determine. The word or phrase is initially
represented by a fixed number of dashes, which corresponds to the number of letters that it
contains. As the second player guesses individual letters, the first player either fills them in

---

[1] For ease of reference, exhibits to the Penchina Declaration will be referred to by letter, e.g. Ex. A, and exhibits to the Lackman Declaration will be referred to by number, e.g. Ex. 1.

above the dash corresponding to where that letter appears in the word or phrase, or draws one element of a man hanging from a scaffold if the letter does not appear anywhere.  The game ends either when a diagram depicting a stick-figure hanging from the gallows is completed, or when the second player has correctly determined the entire word or phrase.  The exact nature of the diagram may vary, with some players choosing to draw the gallows before the game begins, while others may draw individual elements of the gallows as part of the game or draw a more detailed stick figure in order to provide more chances to guess letters.  (See generally Ex. 1.) Since the books provide the puzzles, they are designed to be played solely by one player.  Thus, "[w]hen you play the game . . . , either you win or you die.  There is no middle ground."  George R.R. Martin, A Game of Thrones 488 (1996).

The S&S Books were initially published in Australia and New Zealand.  They were introduced into the United States market in 2005 and are subject to registered copyrights.  To date, nearly two million copies have been sold.  In or around 2008, AMP began publishing books based on the hangman game as part of its "Pocket Posh" book series (the "PP Books").  Ward alleges that the PP Books "incorporate the entire concept, feel, and design of the S&S . . . Books" (Compl. ¶ 18), taking their "overall appearance and trade dress," "lift[ing] their layout and style of the text . . . and even the appearance of the typefaces," "misappropriate[ing] the style and appearance of the hanging-man drawing" (id. at ¶ 19), and "copy[ing] a substantial number of the answers."  (Id. at ¶ 20.)  Copies of both PP Books and S&S Books have been provided to the Court, and the Complaint included an exhibit reproducing puzzles from an S&S and PP Book, reproduced below.  The first image is of Plaintiff's puzzle, and the latter is Defendant's:





## DISCUSSION

Since this is a motion to dismiss, the Court "accept[s] as true all of the factual allegations contained in the complaint" and construes it in the light most favorable to the plaintiff.  Bell Atl. Corp. v. Twombly, 550 U.S. 544, 572 (2007).  The Court only "assess[es] the legally feasibility of the complaint;" it does not "assay the weight of the evidence which might be offered in support thereof."  Levitt v. Bear Stearns & Co., 340 F.3d 94, 101 (2d Cir. 2003).  To state a facially plausible claim, a plaintiff must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  Ashcroft v. Iqbal, 556 U.S. 662, 677 (2009).  "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'  Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'"  Id. (quoting Twombly, 550 U.S. at 557).

## I.      Copyright

### A.      Standard

"Before asking a court to consider the question of infringement, a party must demonstrate the existence and the validity of its copyright, for in the absence of copyright," works that "are in the public domain . . . may be freely copied."  Durham Indus., Inc. v. Tomy Corp., 630 F.2d 905, 908 (2d Cir. 1980).  "The *sine qua non* of copyright is originality.  To qualify for copyright protection, a work must be original to the author," which "means only that the work was independently created by the author (as opposed to copied from other works), and that it possesses at least some minimal degree of creativity."  Feist Publ'ns, Inc. v. Rural Tel. Serv. Co., 499 U.S. 340, 345 (1991).

Two limitations on copyright protection are at issue.  First, "[i]t is an axiom of copyright

law that the protection granted to a copyrightable work extends only to the particular expression of an idea and never to the idea itself." Reyher v. Children's Television Workshop, 533 F.2d 87, 90 (2d Cir. 1976). The idea-expression dichotomy "has produced a corollary maxim that even expression is not protected in those instances where there is only one or so few ways of expressing an idea that protection of the expression would effectively accord protection to the idea itself." Kregos v. Assoc. Press, 937 F.2d 700, 705 (2d Cir. 1991). "Concededly, despite the importance of this dichotomy in delineating the scope of protection to be afforded a copyrighted work, it is a difficult task . . . to distill the nonprotected idea from protected expression," as "often the determination is a matter of degree" and "[d]ecisions must therefore inevitably be ad hoc." Durham, 630 F.2d at 912 (internal quotations omitted). Second, an "equally important limitation on the scope of copyright protection" is that "[j]ust as copyright protection extends to expression but not ideas, copyright protection extends only to the artistic aspects, but not the mechanical or utilitarian features, of a protected work." Id. at 913.

Once the validity of a copyright has been established, the plaintiff must next prove infringement by demonstrating that "'(1) the defendant has actually copied the plaintiff's work; and (2) the copying is illegal because a substantial similarity exists between the defendant's work and the protectable elements of plaintiff's.'" Peter F. Gaito Architecture, LLC v. Simone Dev. Corp., 602 F.3d 57, 63 (2d Cir. 2010) (quoting Hamil Am., Inc. v. GFI, 193 F.3d 92, 99 (2d Cir. 1999)). "The standard test for substantial similarity between two items is whether an 'ordinary observer, unless he set out to detect the disparities, would be disposed to overlook them, and regard [the] aesthetic appeal as the same." Yurman Design, Inc. v. PAJ, Inc., 262 F.3d 101, 111 (2d Cir. 2001) (quoting Hamil Am., 193 F.3d at 100). Where works have both protectable and unprotectable elements, however, courts "'must attempt to extract the unprotectable elements

from [their] consideration and ask whether the protectable elements, standing alone, are substantially similar.'" Gaito Architecture, 602 F.3d at 66 (quoting Knitwaves, Inc. v. Lollytogs Ltd., 71 F.3d 996, 1002 (2d Cir. 1995)). In doing so, however, the Second Circuit has also "disavowed any notion that we are required to dissect [the works] into their separate components and compare only those elements which are in themselves copyrightable," because courts are still "principally guided by comparing the contested design's total concept and overall feel with that of the allegedly infringed work, as instructed by our good eyes and common sense." Id. (internal quotations omitted). As the Second Circuit has explained,

> This is so because the defendant may infringe on the plaintiff's work not only through literal copying of a portion of it, but also by parroting properties that are apparent only when numerous aesthetic decisions embodied in the plaintiff's work of art – the excerpting, modifying, and arranging of unprotectable elements – are considered in relation to one another. Thus, in the end, our inquiry necessarily focuses on whether the alleged infringer has misappropriated the original way in which the author has selected, coordinated, and arranged the elements of his or her work.

Id. (internal quotations omitted). "Courts have noted the apparent tension" between these tests, Gordon v. McGinley, No.11 Civ. 1001, 2011 WL 3648606, at *2 (S.D.N.Y. Aug. 18, 2011), though they may be reconciled by interpreting them together to mean "'that, while the infringement analysis must *begin* by dissecting the copyrighted work into its component parts in order to clarify precisely what is not original, infringement analysis is not *simply* a matter of ascertaining similarity between components viewed in isolation.'" Canal + Image UK Ltd. v. Lutvak, 773 F. Supp. 2d 419, 429 (S.D.N.Y. 2011) (quoting Tufenkian Import/Export Ventures, Inc. v. Einstein Moomjy, Inc., 338 F.3d 127, 134 (2d Cir. 2003)).

"[Q]uestions of non-infringement have traditionally been reserved for the trier of fact" because "the question of substantial similarity typically presents an extremely close question of fact," though courts may "resolve that question as a matter of law" where "'the similarity

between two works concerns only non-copyrightable elements of the plaintiff's work, or [where] no reasonable jury, properly instructed, could find that the two works are substantial similar.'" Gaito Architecthure, 602 F.3d at 63 (quoting Warner Bros. Inc. v. ABC, 720 F.2d 231, 240 (2d Cir. 1983)).

    B.    <u>Analysis</u>

    Ward alleges that the PP Books take "the overall appearance[,] . . . layout and style of the text – including the rows of scratch-off letters . . . and answer location," and "the appearance of the hanging-man drawing" from the S&S Books.  (Compl. ¶ 20.)  The Court addresses each of these aspects of the works in question.  It will not, however, address Ward's assertion that AMP's instructions page copies the instructions contained in the S&S Books "because 'new facts and allegations, first raised in a Plaintiff's opposition papers, may not be considered' in deciding a motion to dismiss."  <u>Universal Trading & Inv. Co., Inc. v. Tymoshenko</u>, No. 11 Civ. 7877, 2012 WL 6186471, *1 (S.D.N.Y. Dec. 12, 2012) (quoting <u>Simone v. U.S.</u>, No. 09 Civ. 3904, 2012 WL 4891617, *6 (E.D.N.Y. Oct. 9, 2012)).

    1.    Scratch-Off letters

    With regard to the scratch-off letters in each work, Ward argues that "the commonalities reside . . . not just [in] scratch-off functionality, but [in] silver circles covering similar-looking 'x' marks."  (Pl. Opp'n at 13.)  There are several problems with this argument.  First, factually, when the circles below an incorrect letter are scratched off, only the PP Books display an "**x**" to signify an incorrect answer; the S&S Books submitted to the Court display a hangman sticking out his tongue at the player in a taunting manner.[3]

---

[3] Ward has submitted the instructions page of his Hangwoman book, which states that the player will "see a bold **X** to indicate [that their] guess is incorrect" (Lackman Decl. Ex. 3), though the only evidence submitted to the Court in





(S&S Books)                    (PP Books)

Aside from the image of the hangman, which AMP did not copy, no aspect of the lettering scheme is protected.  Though the Copyright Act protects pictorial and graphic works, it does not protect "their mechanical or utilitarian aspects" unless "such design incorporates pictorial, graphic, or sculptural features that can be identified separately from, and are capable of existing independently of, the utilitarian aspects of the article."   17 U.S.C. § 101; see also Durham Indus., 630 F.2d at 914-15.  There are no such protectable features in the scratch-off lettering.  The silver circles are not protected because a "plaintiff can have no monopoly in . . . colors . . . [or] circular . . . shapes."  Kitchens of Sara Lee, Inc. v. Nifty Foods Corp., 266 F.2d 541, 545 (2d Cir. 1959); see also Atari Games Corp. v. Oman, 979 F.2d 242, 247 (D.C. Cir. 1992).  Nor are the "variations of typographic ornamentation, lettering, or coloring" subject to copyright protection.  37 C.F.R. § 202.1(a); see also Steinberg v. Columbia Pictures Indus., Inc., 663 F. Supp. 706, 711 n.2 (S.D.N.Y. 1987).   Finally, the arrangement of the letters in alphabetical order is not protected by copyright, as organizing information alphabetically "do[es] not satisfy the minimum constitutional standards for copyright protection" because it is "devoid of even the slightest trace of creativity."  Feist, 499 U.S. at 362.

---

which actual puzzles from S&S Books are included displays the image discussed supra.  Regardless, "a bold **X**" is not protected by copyright.  (See infra at § 1(B)(4).)

8

2.      Answers

Ward asserts that the PP Books copy a significant number of answers from the S&S Books.  It is beyond peradventure that each answer is not individually protected by copyright.  All of the answers are either "words [or] short phrases such as names, titles and slogans," which are not copyrightable.  37 C.F.R. § 202.1(a).  To the extent that the "*selection* and *arrangement* of the [unprotected] terms were original," Ward alleges that only a small portion of the answers selected for inclusion in the S&S Books were copied and does not claim that they were copied in the same order as originally presented.  Lipton v. Nature, 71 F.3d 464, 470 (2d Cir. 1995) (emphasis in original) (finding substantial similarity where 72 of 77 terms were copied and where 24 of the first 25 terms in infringing work were contained in original work, with all but four in the same order).

Moreover, even assuming *arguendo* that the PP Books did copy copyrightable answers, Ward has failed to plead his claim with sufficient particularity.  In alleging that the answers are copied from "previously published S&S Hangman Books," Ward does not specify which books the answers are derived from nor which answers have been copied.  (Compl. ¶ 20.)  Though the Complaint does not identify the number of S&S Books that Ward has published, it notes that he holds copyright registration certificates for "over two dozen" (id. at ¶ 16), and that he has been publishing them "[f]or nearly twenty years."  (Id. at ¶ 11.)  Where a plaintiff alleges that portions of a number of works have been infringed, it must identify the allegedly infringed works.  See Sharp v. Patterson, No. 03 Civ. 8772, 2004 WL 2480426, *14 (S.D.N.Y. Nov. 3, 2004); Dimaggio v. Int'l Sports Ltd., No. 97 Civ. 7767, 1998 WL 549690, *2 (S.D.N.Y. Aug. 31, 1998); Cole v. Allen, 3 F.R.D. 236, 237 (S.D.N.Y. 1942).

3.    Pictorial Depiction

AMP contends that a drawing of a hanging stick figure, as used in both the S&S and PP Books, is not protectable by copyright law because it is central to the game itself, flowing naturally from the very concept of hangman.  In advancing this argument, AMP relies on two cases, neither of which provide it with much support.  First, Universal Athletic Sales Co. v. Salkeld, 511 F.2d 904 (3d Cir. 1975), held that the use of stick figures in instruction manuals for exercise equipment were not sufficiently similar to constitute copyright infringement, concluding that while "[t]he ideas are similar, . . . the expressions are not substantially so."  Id. at 909. Salkeld did not discuss whether the depictions at issue were copyrightable, or, more broadly, whether depictions involving stick figures could be copyrightable.  Rather, it proceeded on the assumption that the  plaintiff's depictions were protected by copyright and addressed only "whether the defendants' expression of a concept, basic to the use of both its product and plaintiff's, was so substantially similar as to amount to an infringement."  Id. at 906.

Second, Boisson v. Banian, Ltd., 273 F.3d 262 (2d Cir. 2001), affirmed that "the alphabet is in the public domain" because "copyright protection does not apply to 'familiar symbols or designs' or 'mere variations of . . . lettering.'"  Id. at 269 (quoting 37 C.F.R. § 202.1(A) (2000)). AMP would have the Court find that stick figure drawings, made entirely of simple and faimilar symbols, are similarly not protectable.  Boisson, which addressed the copyrightability of the alphabet in particular, does not bar copyright protection from applying to original compositions composed of a unique combination of basic symbols, designs or letters.  To find otherwise would create an exception to copyright protection that would quickly swallow the rule because any creative work could be broken down into its most basic, potentially unprotectable, components. See Knitwaves, 71 F.3d at 1003 ("if we took this argument to its logical conclusion, we might

10

have to decide that there can be no originality in a painting because all colors of paint have been used somewhere in the past.").

The "argument that any claim of infringement based on stick figures fails as a matter of law is an overstatement," though such depictions may be "entitled only to very thin protection." OG Int'l, Ltd. v. Ubisoft Entm't, No. 11 Civ. 4980, 2011 WL 5079552, at *6 (N.D. Cal. Oct. 26, 2011).   It is well-settled that "the requisite level of creativity [for copyright protection] is extremely low; even a slight amount will suffice.  The vast majority of works make the grade quite easily, as they possess some creative spark, no matter how crude, humble, or obvious it might be." Feist, 499 U.S. at 345 (internal quotations omitted).  Accordingly, while "the idea of a cartoon figure" engaged in "everyday activities" is not copyrightable, specific illustrations can be protected.  Blehm v. Jacobs, 702 F.3d 1193, 1203-05 (10th Cir. 2012).  "Although some may discount [the] drawings as simple stick figures," each specific expression may "reflect particular stylistic choices [the artist] has made" in order "to achieve a unique expression" that can "easily clear" the originality threshold.  Id. at 1205.

The differences between the illustrations contained in the S&S and PP Books demonstrate that some originality was used in each.  First, the orientation of the stick figure and gallows vary in the S&S Books, such that the vertical shaft of the gallows always appears between the stick figure and the edge of the page, while the gallows are always to the right of the stick figure in the PP Books.  Second, the horizontal base of the gallows in the S&S books extends slightly beyond the vertical shaft which arises up from it in the S&S Books, while the rightmost edge of the horizontal base and vertical shaft of the gallows in the PP Books are coterminous.  Third, and similarly, the same distinction appears in the corner of the depictions at which the vertical shafts meet the horizontal shaft from which the nooses descend: the edges of

11

the two pieces are coterminous in the PP Books, while the vertical shaft extends upwards beyond the top of the horizontal shaft in the S&S Books.  Fourth, the gallows in the PP Books contain an additional diagonal piece supporting the vertical and horizontal shafts in the upper-right corner of the gallows pole, while such a piece is missing from the depictions in the S&S Books.  Fifth, the rope in the S&S Books curves around the head of the hanging stick figure, while it descends in a straight line in the PP Books.  Sixth, the noose in the PP Books contains a knot, while the S&S noose does not.  Seventh, the noose rests more loosely around the neck of the stick figure in the PP Books than in the S&S Books.  Eighth, in comparison with the gallows pole, the proportions of the stick figure in the S&S Books are much larger than that in the PP Books. Ninth, the head of the stick figure in the PP Books is less ovular than that in the S&S Books. Tenth, the arms of the stick figure in the S&S Book point in opposite directions, while in the PP Books both arms are angled downward.  Eleventh, and finally, the limbs of the figures in the PP Books are straight, while those in the S&S Books are curved.  "Even if [the illustrations are] not the expressive equal of *Anna Karenina* or *Citizen Kane*," Brown v. Elec. Arts, Inc., -- F.3d --, 2013 WL 3927736, *3 (9th Cir. 2013), they display the minimal "modicum of creativity" needed for copyright protection.  Salkeld, 511 F.2d at 908.

Based on the foregoing, it is clear that the hangman illustrations are protected by copyright, but the scratch-off lettering and answers to the hangman puzzles are not.  Whether the illustrations or total concept and overall feel of the PP Books are substantially similar to those of the S&S Books presents a close factual question.  Accordingly, it will be left for a jury to determine.  AMP's motion to dismiss the copyright infringement claim is denied.

II.     **Trade Dress**

A.     Legal Standard

While much of the Lanham Act addresses trademarks, 15 U.S.C. § 1125(a) is one of the few provisions that addresses trade dress, protecting against both passing off and reverse passing off. "The trade dress of a product 'involves the total image of a product and may include features such as size, shape, color or color combinations, texture or graphics.'" Stormy Clime Ltd. v. ProGroup, Inc., 809 F.2d 971, 974 (2d Cir. 1987) (quoting John H. Harland Co. v. Clarke Checks, Inc., 711 F.2d 966, 980 (11th Cir. 1983)). "Passing off . . . occurs when a producer misrepresents his own goods or services as someone else's," whereas "[r]everse passing off . . . is the opposite: [t]he producer misrepresents someone else's goods or services as his own." Dastar Corp. v. Twentieth Century Fox Film Corp., 539 U.S. 23, 27 n.1 (2003); see also id. at 32 (the Lanham Act "forbids, for example, the Coca-Cola Company's passing off its product as Pepsi-Cola or reverse passing off Pepsi-Cola as its product."). "To plead a claim of trade dress infringement involving the appearance of a product, [plaintiffs] must allege that (1) the claimed trade dress is non-functional;[4] (2) the claimed trade dress has secondary meaning; and (3) there is a likelihood of confusion between the plaintiff's good and the defendant's." Sherwood 48 Assocs. v. Sony Corp. of Am., 76 Fed. App'x 389, 391 (2d Cir. 2003).

B.     Analysis

*1.     Applicability of the Lanham Act*

AMP asserts that Ward's trade dress is duplicative of its copyright claim and therefore not cognizable under the Lanham Act. "The principal purpose of [the Lanham Act] is to 'secure

---

[4] This is a notable distinction between trade dress and trademark law, in which functionality remains an affirmative defense. See Christian Louboutin, 696 F.3d at 217. Prior to the Trademark Amendments Act of 1999, Pub. L. 106-43, § 5 (1999), functionality was an affirmative defense to trade dress infringement claims in this circuit. Yurman Design, Inc. v. PAJ, Inc., 262 F.3d 101, 116 (2d Cir. 2001).

the public's interest in protection against deceit as to the sources of its purchases, and the businessman's right to enjoy business earned through investment in the good will and reputation attached to a trade name.'" Christian Louboutin S.A. v. Yves Saint Laurent Am. Holding, Inc., 696 F.3d 206, 215 (2d Cir. 2012) (quoting Fabrication Enters., Inc. v. Hygenic Corp., 64 F.3d 53, 57 (2d Cir. 1995)).  "[B]y preventing others from copying a source-identifying mark" or dress, the Lanham Act "'reduces the customer's cost of shopping and making purchasing decisions'" and "helps assure a producer that it (and not an imitating competitor) will reap the financial, reputation-related rewards associated with a desirable product." Qualitex Co. v. Jacobson Prods. Co., Inc., 514 U.S. 159, 164 (1995) (quoting 1 J. McCarthy, McCarthy on Trademarks and Unfair Competition § 2.01 (3d ed. 1994)).   In other words, the Lanham Act is meant to "'encourage the production of quality products,' and simultaneously discourage[] those who hope to sell inferior products by capitalizing on a consumer's inability quickly to evaluate the quality of an item offered for sale." Id.   "It does not protect the content of a creative work of artistic expression" because an "artist's right in an abstract design or other creative work" is protected by copyright law.  EMI Catalogue P'ship v. Hill, Holiday, Connors, Cosmopulos Inc., 228 F.3d 56, 63 (2d Cir. 2000).

In Dastar, 539 U.S. at 26-27, the Supreme Court addressed a case involving overlapping copyright and Lanham Act claims.  Specifically, Dastar produced and sold a video about World War II as its own product in 1995, in which it copied, edited, cut and added material to video from a 1949 television series that had fallen into the public domain.  The television series, in turn, was based on a 1948 book, the copyright for which had been renewed in 1975, and to which the producers of the television series had the exclusive television rights.  Dastar's video included no references to or images from the book and made no reference to the existence of the television

14

series.  It was subsequently sued for infringing the book's copyrights and for reverse passing off under the Lanham Act.  The Supreme Court found that Dastar could not be held liable under the Lanham Act because 15 U.S.C. § 1125(a) only protects against confusion regarding "the producer of the tangible goods that are offered for sale, and not . . . the author of any idea, concept, or communication embodied in those goods."  Id. at 37-38.  The parties did not dispute that Dastar had produced the videos it sold and, for Lanham Act purposes, it was irrelevant that they incorporated material from the television series or ideas from the books.  See 5 J. McCarthy, McCarthy on Trademarks and Unfair Competition § 27:78 (4th ed. 2013).

Dastar does not foreclose Lanham Act claims that are based on the same underlying conduct as copyright claims.  Although it noted in *dicta* that courts must exercise "'caution against misuse or over-extension' of trademark and related protections into areas traditionally occupied by patent or copyright" when dealing with "a communicative product – one that is valued not primarily for its physical qualities, such as a hammer, but for the intellectual content that it conveys, such as a book," Dastar, 539 U.S. at 33-34 (quoting TrafFix Devices, Inc. v. Marketing Displays, Inc., 532 U.S. 23, 29 (2001)), in order to avoid creating "a species of mutant copyright law that limits the public's 'federal rights to copy and to use'" material not protected by copyright, id. at 34 (quoting Bonito Boats, Inc. v. Thunder Craft Boats, Inc., 489 U.S. 141, 165 (1989)), this admonition does not bar plaintiffs from concurrently alleging violations of more than one category of intellectual property law.  Rather, "courts have consistently held that a product's different qualities can be protected simultaneously, or successively, by more than one of the statutory means for protection of intellectual property."  Kohler Co. v. Moen Inc., 12 F.3d 632, 638 (7th Cir. 1993); see also Application of Penthouse Int'l, Ltd., 565 F.2d 679, 683 n.3 (C.C.P.A. 1977).  Accordingly, courts have continued to find that trade dress infringement

15

claims are not duplicative of copyright claims and allow plaintiffs to assert both causes of action simultaneously.  See Pearson Educ., Inc. v. Boundless Learning, Inc.,No. 12 Civ. 1986, 2013 WL 357631, *4 (S.D.N.Y. Jan. 30, 2013); Tetris Holding, LLC v. Xio Interactive, Inc., 863 F. Supp. 2d 394, 416 (D.N.J. 2012); Slep-Tone Entm't Corp. v. Arrowood, No. 10 Civ. 592, 2011 WL 4482082, at *3 (S.D. Ohio Sept. 26, 2011).

2.       *Protectable Trade Dress*

a)        Defining the Asserted Trade Dress

Trade dress "'involves the total image of a product.'" Louis Vuitton Malletier v. Dooney & Bourke, Inc., 500 F. Supp. 2d 276, 277 (S.D.N.Y. 2007) (quoting George Basche Co. v. Blue Coral, Inc., 968 F.2d 1532, 1535 (2d Cir. 1992)).  "Thus, 'although each element of a trade dress individually might not be inherently distinctive, . . . the combination of elements' may be indicative of source."  Landscape Forms, Inc. v. Columbia Cascade Co., 113 F.3d 373, 381 (2d Cir. 1997) (quoting Jeffrey Milstein, Inc. v. Greger, Lawlor, Roth, Inc., 58 F.3d 27, 32 (2d Cir. 1995)).  "A plaintiff seeking to protect its trade dress in a line of products must articulate the design elements that compose the trade dress," Yurman Design, 262 F.3d at 116, and, in doing so, must make clear "how they are distinctive."  Nat'l Lighting Co., Inc. v. Bridge Metal Indus., LLC, 601 F. Supp. 2d 556, 562 (S.D.N.Y. 2009); cf. Jeffrey Millstein, 58 F.3d at 33 ("The level of generality at which a trade dress is described . . . may indicate that that dress is no more than a concept or idea to be applied to particular products.").

Ward pleads that all of the S&S Books employ the same trade dress, including:

a series of silver scratch-off circles below each letter of the alphabet, depicted in a few rows.  Below that element appear numbered blanks for the answers.  Next to the scratch-off alphabet section appears a dashed-line depiction of a stick figure with a noose placed loosely around its neck.

16

(Compl. ¶ 14.)   Ward further asserts that the PP Books "even misappropriate the style and appearance of the hanging-man drawing (including the body outline, noose and gallows)" from the S&S Books.  (Id. at ¶ 19.)

This is sufficient to establish the elements of Ward's trade dress claim.  Unlike the cases on which AMP relies, Ward has not pled "such broad assertions of trade dress protection" as to "provide . . . a viable infringement action against any competitor" or "grant . . . a monopoly over a concept."  Shevy Custom Wigs, Inc. v. Aggie Wigs, No. 06 Civ. 1657, 2006 WL 3335008, *5 (E.D.N.Y. Nov. 17, 2006).  Nor has Ward offered only a "vague description of its claimed trade dress" accompanied by exhibits, Heller Inc. v. Design Within Reach, Inc., No. 09 Civ. 1909, 2009 WL 2486054, *6 (S.D.N.Y. Aug. 14, 2009), or "a laundry list of the elements" lacking specificity.  Nat'l Lighting, 601 F. Supp. at 562.  Rather, Ward has adequately explained how his trade dress is distinctive based on both the color scheme used and the general layout and spatial relationship of the various elements appearing on each page of his books.  See Urban Grp. Exercise Consultants, Ltd. v. Dick's Sporting Goods, Inc., No. 12 Civ. 3599, 2012 WL 3240442, at *5 (S.D.N.Y. Aug. 7, 2012).

b)      Secondary Meaning  and Likelihood of Confusion

"To establish secondary meaning, a manufacturer must show that, in the minds of the public, the primary significance of a product feature or term is to identify the source of the product rather than the product itself."  Inwood Labs., Inc. v. Ives Labs., Inc., 456 U.S. 844, 851 n.11 (1982).  It is well-established that "to determine the likelihood of confusion, 'courts in the Second Circuit apply the eight [Polaroid] factors,'" which are "(1) the strength of the plaintiff's trade dress; (2) similarity of the trade dresses; (3) proximity of the products in the marketplace; (4) likelihood that the plaintiff will bridge the gap between the products (enter a market related to

that in which the defendant sells its product); (5) evidence of actual confusion; (6) the defendant's bad faith; (7) quality of the defendant's product; and (8) sophistication of the relevant consumer group." Natural Organics, Inc. v. Nutraceutical Corp., 426 F.3d 576, 578 (2d Cir. 2005) (quoting Playtex Prods., Inc. v. Georgia-Pacific Corp., 390 F.3d 158, 162 (2d Cir. 2004), and citing Polaroid Corp. v. Polarad Elecs. Corp., 287 F.3d 492, 495 (2d Cir. 1961)).

It would be premature to address either the existence of a secondary meaning or the likelihood of confusion prior to discovery, and, accordingly, the Court declines to do so. See Coach Leatherware Co., Inc. v. AnnTaylor, Inc., 933 F.2d 162, 169 (2d Cir. 1991); Ritani, LLC v. Aghjayan, 880 F. Supp. 2d 425, 446 (S.D.N.Y. 2012); Merck & Co., Inc. v. Mediplan Health Consulting, Inc., 425 F. Supp. 2d 402, 412 (S.D.N.Y. 2006). None of the cases cited by AMP, all of which either address arguments not presently before the Court or which were not decided upon motions to dismiss, suggest otherwise.

### c)      Functionality

"A plaintiff is barred from gaining trade dress protection for a product if the trade dress is functional," in order to prevent trade dress law "from inhibiting legitimate competition by giving monopoly control to a producer over a useful product." Nora Beverages, Inc. v. Perrier Grp. of Am., 269 F.3d 114, 120 n.4 (2d Cir. 2001). "This is so because functional features can be protected only through the patent system, which grants a limited monopoly over such features until they are released into general use" after the patent's expiration. Christian Louboutin, 696 F.3d at 218-19. Generally, "a product feature is functional if it is essential to the use or purpose of the article or if it affects the cost or quality of the article." Inwood Labs., 456 U.S. at 851 n.10. "[I]n cases involving an aesthetic feature, the dress is also functional if the right to use it exclusively 'would put competitors at a significant non-reputation-related disadvantage.'"

Yurman Design, 262 F.3d at 116 (quoting TrafFix Devices, 532 U.S. at 32).

Failure to plead non-functionality is fatal to trade dress infringement claims.  Telebrands Corp. v. Del Labs., Inc., 719 F. Supp. 2d 283, 298 n.10 (S.D.N.Y. 2010).  Since the Complaint contains no mention of functionality whatsoever, it must be dismissed.[5]  Accordingly, AMP's motion is granted with respect to trade dress infringement, with leave for Ward to file an amended complaint.

## III.   Unfair Competition

AMP asserts that Ward's unfair competition claim is preempted by federal copyright law, which preempts "all legal or equitable rights that are equivalent to any of the exclusive rights within the general scope of copyright as specified by" the federal Copyright Act.  17 U.S.C. § 301(a).  Nevertheless, "if an 'extra element' is 'required instead of or in addition to the acts of reproduction, performance, distribution or display, in order to constitute a state-created cause of action, then the right does not lie within the general scope of copyright, and there is no preemption.'"  Computer Assocs. Int'l, Inc. v. Altai, Inc., 982 F.2d 693, 717 (2d Cir. 1992) (quoting 1 Melville B. Nimmer & David Nimmer, Nimmer on Copyright §1.01[B] (1991)). Under this test, "the Second Circuit has held that unfair competition and misappropriation claims grounded solely in the copying of a plaintiff's protected expression are preempted by federal copyright law," but that "claims that allege the tort of 'passing off' one's goods as those of another or creating confusion as to the source of goods are not preempted because they do not entail the assertion of rights equivalent to those protected by federal copyright law."  Colour &

---

[5] The Court notes that at the January 14, 2013 pre-motion conference, counsel for Ward expressed its willingness to amend its complaint to state that "the elements [of its trade dress] are non-functional," but counsel for AMP stated that such an amendment would be futile in that it would not deter AMP from moving forward with its motion to dismiss.  Oral arg. at 5:18, Ward v. Andrews McMeel Publ'g, LLC, No. 12 Civ. 7987 (S.D.N.Y. Jan. 14, 2013); see also oral arg. tr. at 17-18, July 18, 2013.

Design v. U.S. Vinyl Mfg. Corp., No. 04 Civ. 8332, 2005 WL 1337864, *6 (S.D.N.Y. June 3, 2005); see also Warner Bros., 720 F.2d at 247.

Ward has alleged that AMP is passing off its infringing works as those of Brainteaser, "improperly trading upon Brainteaser's goodwill and Brainteaser's valuable rights in and to the Brainteaser trade dress," and that this has been done "willfully, in bad faith and in conscious disregard of Brainteaser's rights." (Compl. ¶ 35-36.) As a result, "[c]onsumers are mistakenly led to believe that Brainteaser is the source of AMP's . . . books or that AMP endorsed, licensed from, or is otherwise affiliated with Brainteaser." (Id. at ¶ 35.) They have thereby adequately pled a claim for unfair competition under New York common law, which requires "(1) either factual confusion or a likelihood of confusion; and (2) bad faith on the part of the defendant." SLY Magazine LLC v. Weider Publ'ns LLC, 529 F. Supp. 2d 425, 443 (S.D.N.Y. 2007). Since such claims are not preempted by federal copyright law, AMP's motion to dismiss is denied.

## CONCLUSION

For the forgoing reasons, the Court GRANTS AMP's motion to dismiss the trade dress infringement claim, with leave to replead by August 30, 2013, and DENIES AMP's motion with respect to Ward's copyright and unfair competition claims. Further, the parties are hereby instructed to meet and confer and submit a case management plan to the Court by September 16, 2013. The Clerk of the Court is directed to terminate the motion at docket number 6.

Dated: New York, New York
August 1, 2013

SO ORDERED

PAUL A.CROTTY
United States District Judge

20